IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| BOAR'S HEAD PROVISIONS CO., INC., <br><br> Plaintiff, <br><br> v. <br><br> CRYSTAL DISTRIBUTION SERVICES, INC., <br><br> Defendant. | Case No. 18-2030 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Boar's Head Provisions Co., Inc. ("**Boar's Head**") hereby alleges for its complaint against Crystal Distribution Services, Inc. ("**Crystal**") as follows:

### Nature of the Case

1. This action concerns a warehouse company's mishandling of another's property. Boar's Head brings this action against Crystal for negligence, breach of contract, and rescission of contract, all with the goal of being made whole for the damage caused by Crystal's negligent mishandling of Boar's Head's property.

### Parties

2. Plaintiff Boar's Head Provisions Co., Inc., is a Delaware corporation with its principal place of business in Sarasota, Florida.

3. Defendant Crystal Distribution Services, Inc., is an Iowa corporation with its principal place of business in Waterloo, Iowa.

### Jurisdiction

4. The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because Boar's Head and Crystal are citizens of different states and the matter in controversy exceeds the sum of $75,000.

5. This Court has jurisdiction over Crystal because Crystal is a resident of Iowa.

6. The Northern District of Iowa is a proper venue for this action pursuant to 28 U.S.C. § 1391(b) because Crystal resides in this judicial district and because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this judicial district.

## Facts

7. Boar's Head manufactures and sells deli meats, cheeses, and condiments throughout the United States. Products sold under the Boar's Head brand are sold in high-end delicatessens and supermarkets throughout the country.

8. From time to time, Boar's Head also sells excess raw meat supplies to other companies, allowing those companies to prepare and sell the product under their own brands.

9. In January 2016, Boar's Head purchased a large shipment of fresh turkey breast meat from a third-party meat supplier. The quantity exceeded Boar's Heads immediate needs so Boar's Head quickly sought to identify a food warehouse business to blast freeze and store the product until Boar's Head would be able to sell it.

10. Boar's Head identified Crystal and discussed Boar's Head's needs. Crystal represented that it was capable of safely packaging, blast freezing, and storing the turkey meat on the tight timeframe demanded under the circumstances.

11. Boar's Head asked Crystal to provide quotes for the costs of its services, and Crystal provided those quotes by email.

12. Boar's Head orally accepted Crystal's offer to package, freeze, and store the turkey product it had purchased at the rates quoted by Crystal. Boar's Head then delivered several truckloads of fresh turkey meat to Crystal to be frozen, packaged, and stored as agreed.

13. On or about February 3, 2016, Boar's Head received its first invoices from Crystal. These invoices contained charges for boxing and blast freezing that took place on January 24 and 31, 2016.

14. On or about February 10, 2016, Boar's Head received an invoice for the initial storage fees for the frozen turkey product.

15. A one-page document entitled "Crystal Distribution Services Inc. Contract Terms and Conditions" was attached to the aforementioned invoices. The document is identified as a "warehouse receipt" and contains terms pertaining to the storage of goods. This warehouse receipt does not contain terms pertaining to the freezing and packaging of goods in advance of storage.

16. Crystal continued to send periodic invoices for storage fees, and Boar's Head paid them.

17. Boar's Head paid Crystal approximately $70,000 in total packaging, freezing, handling, storage, and related charges.

18. In August 2016, Boar's Head sold approximately 287,349 pounds of the frozen turkey product then being held in Crystal's warehouse to a third party. At the buyer's request, Boar's Head directed Crystal to ship the turkey product to Nor-Am Cold Storage, another warehouse facility.

19. In April 2017, Nor-Am began the tempering (thawing) process and discovered that a significant portion of the frozen turkey product was contaminated with bits of plastic, cardboard, wood chips, and at least one insect. This foreign material was *inside the packaging applied by Crystal* before blast freezing the product, which indicated the contamination occurred during Crystal's handling of the product.

20. Upon discovering this foreign material, Boar's Head's buyer rejected the goods and demanded to be reimbursed by Boar's Head.

21. Boar's Head did not know and had no reasonable way of discovering that Crystal had contaminated the product it had agreed to store for Boar's Head until that product was thawed by Boar's Head's buyer.

22. Upon receiving notice that its buyer was rejecting the goods, Boar's Head promptly contacted Crystal and demanded reimbursement for the entire value of this damaged product, plus handling costs (a total of $540,112.69).

23. Crystal initially told Boar's Head it would accept full responsibility. But later, through Crystal's outside counsel, Crystal advised Boar's Head it would not pay more than $140,000 because it was asserting that its liability was limited by the Warehouse Agreements attached to its invoices.

24. On July 13, 2017, Boar's Head again demanded full payment of the $540,112.69 owed as a result of Crystal's mishandling of the turkey product.

25. Through a series of negotiations, in order to mitigate damages resulting from Crystal's mishandling of the product, the parties ultimately entered into a Product Disposal Agreement on October 11, 2017, under which they sold all of the product that remained in Crystal's possession to a third party for $206,003.58. The Product Disposal Agreement expressly provides that "Boar's Head reserves and does not waive any rights to claim the full amount of its recoverable damages as a result of Crystal's alleged mishandling of the Subject Goods (minus the amount recovered through the sale of the Subject Goods)."

26. On or about December 18, 2017, Crystal paid $206,003.58 to Boar's Head. Boar's Head demanded the remaining $334,109.11 still owed as a result of Crystal's actions.

27. Boar's Head's counsel has contacted Crystal's counsel multiple times by phone and by email in an effort to resolve this dispute. Crystal's counsel has not been responsive. Boar's Head therefore brings this suit to recover the remaining amount owed to Boar's Head as a result of Crystal's mishandling of Boar's Head's turkey product while it was in Crystal's possession.

## Count I

### Negligence

28. Boar's Head adopts and incorporates by reference paragraphs 1–27 as if fully restated herein.

29. Crystal owed a duty to Boar's Head to exercise a reasonable degree of care in handling, freezing, and storing the turkey product received from Boar's Head.

30. Crystal held itself out to Boar's Head as having the experience and expertise necessary to safely handle food products.

31. Crystal breached its duty of care by mishandling the turkey product in such a way as to allow it to be contaminated by foreign materials.

32. Because Boar's Head turkey product was contaminated by foreign materials, Boar's Head buyer rejected the goods, and Boar's Head had to reimburse the buyer for the cost of the goods and shipping expenses.

33. Thus, Crystal's negligent acts were the proximate cause of damage to Boar's Head.

## Count II

### Breach of Contract

34. Boar's Head adopts and incorporates by reference paragraphs 1–27 as if fully restated herein.

35. In or around January 2016, Boar's Head and Crystal formed a valid oral contract whereby Crystal agreed to safely package, freeze, and store Boar's Head's turkey product in exchange for the fees Crystal quoted to Boar's Head for such services.

36. In or around January and February 2016, Crystal breached its oral agreement with Boar's Head by failing package and freeze Boar's Head's turkey product in a safe and commercially acceptable manner.

37. As a result of Crystal's breach of its oral agreement, which Boar's Head discovered in April 2017, Boar's Head was harmed. Boar's Head paid money to Crystal for services it did not receive as expected, and Boar's Head suffered reasonably foreseeable consequential damages as a results of Crystal's mishandling of Boar's Head's turkey product.

## Count III

### Rescission of Contract

38. Boar's Head adopts and incorporates by reference paragraphs 1–27 as if fully restated herein.

39. Beginning on or about February 10, 2016, Boar's Head received invoices from Crystal, which contained charges for storing the turkey product Crystal had previously handled, packaged, and frozen for Boar's Head.

40. The "Crystal Distribution Services Inc. Contract Terms and Conditions" attached to the invoices Boar's Head received from Crystal contained the terms by which Crystal would store Boar's Head's turkey product, which had already been handled, packaged, and frozen by Crystal.

41. To the extent Boar's Head entered into any written agreements with Crystal related to the storage of Boar's Head's turkey product, Boar's Head did so under a mistake of material fact, namely, that Crystal had handled, frozen, and packaged Boar's Head's turkey

product in a safe and commercially reasonable manner that maintained the value of the product as food for human consumption.

42. Unbeknownst to Boar's Head until the product was thawed in April 2017, Crystal had mishandled Boar's Head's turkey product. Had Boar's Head known its turkey product was contaminated when it first received the Crystal Distribution Services Inc. Contract Terms and Conditions, Boar's Head never would have paid those invoices or agreed to retain Crystal's services to store that product for later resale.

43. Boar's Head thought Crystal was agreeing to store safely handled, uncontaminated food product until Boar's Head could identify a buyer. Instead, Boar's Head was paying Crystal to store contaminated and devalued food product.

44. The Crystal Distribution Services Inc. Contract Terms and Conditions, which include limitation-of-liability provisions, are therefore voidable due to a mistake of material fact and should be rescinded.

## Prayer for Relief

WHEREFORE, Boar's Head requests that judgment be granted in Boar's Head's favor and against Defendant and that this Court award Boar's Head the following relief:

(a) Damages in an amount to be proven at trial sufficient to compensate Boar's Head for all damages caused by Defendant's conduct;

(b) Reimbursement of all allowable costs associated with this action;

(c) Pre- and post-judgment interest; and

(d) Any and all additional relief that this Court deems just.

## Jury Demand

Boar's Head hereby demands a trial by jury on all issues as to which trial by jury is allowed.

Dated: May 2, 2018            Respectfully submitted,

                /s/ Desirée A. Kilburg
                Desirée A. Kilburg     AT0010265
                SHUTTLEWORTH & INGERSOLL, P.L.C.
                500 US Bank Bldg., P.O. Box 2107
                Cedar Rapids, IA 52406
                Telephone:     (319) 365-9461
                Fax:               (319) 365-8443
                dak@shuttleworthlaw.com

                *Attorneys for Plaintiff*